MAXIM TECHNOLOGIES, INC., Appellant,

v.

The CITY OF DUBUQUE, Appellee.

No. 03–1355.

Supreme Court of Iowa.

Jan. 7, 2005.

Webb L. Wassmer of Simmons, Perrine, Albright & Elwood, P.L.C., Cedar Rapids, for appellant.

Les V. Reddick of Kane, Norby & Reddick, P.C., Dubuque, for appellee.

STREIT, Justice.

A jury found Maxim Technologies improperly monitored construction of a public parking ramp in Dubuque. Maxim now argues the City of Dubuque should pay for its misdeeds because Dubuque agreed to do so. Because we find the parties' agreement does not clearly and unambiguously express an intention that Dubuque indemnify Maxim under the circumstances of this case, we affirm dismissal of Maxim's claim.

## I. Facts and Prior Proceedings

For the purposes of this appeal, we assume the City of Dubuque hired Maxim Technologies, an independent inspection firm, to monitor construction of a public parking ramp.[1] The parties' agreement included a cost proposal and two attached

---

1. In the district court, Dubuque maintained it did not have a valid agreement with Maxim because the city council never formally approved of one. See Iowa Code § 364.3(1) (2003) ("A city council shall exercise a power only by the passage of a motion, a resolution, an amendment, or an ordinance."). Maxim rejoined that certain provisions in Dubuque's contract with its architect and the ramp's official project manual—two documents that *did* receive formal approval of the city council—met this municipal approval requirement because they (1) contemplated the hiring of an independent consultant and (2) identified Dubuque's parking systems supervisor as Dubuque's "Designated Representative" "authorized to act on [Dubuque's] behalf with respect to the Project." Maxim alleged that the parking systems supervisor hired it to perform inspection services. The facts presented to the jury were as follows:

When the time came to find an inspection firm, Dubuque's architect asked Maxim for a cost proposal. Maxim sent a cost proposal to the architect, attaching two pages of fine print. The architect then sent a letter to the parking systems supervisor listing what work it wanted Maxim to do. The architect authorized approximately one third of the amount of work Maxim had proposed. The architect sent a copy of the letter to Maxim.

Although Maxim indicated in its proposal that it would not work on the project without written authorization, Maxim did so anyway.

Maxim sent all bills to the architect. These bills listed the architect as Maxim's "client." All payments went through the architect. The architect sent Maxim's bills to Dubuque. After receiving a check from Dubuque, the architect would either endorse it over to Maxim or write Maxim a separate check. During her deposition, however, the parking systems supervisor admitted she thought Dubuque, not the architect, had a contract with Maxim. She later recanted.

Although the record does not clearly disclose under what particular contract theory Maxim's claim was based, a jury nonetheless found Maxim had an agreement with Dubuque. Moreover, the jury found the parties' agreement included the fine print at issue in this appeal, i.e., a paragraph in which, Maxim alleged, Dubuque agreed to indemnify Maxim for Maxim's own negligence. Notwithstanding the jury's findings, however, the district court held as a matter of law that Maxim did not have a valid agreement with Dubuque because the city council never gave its formal approval. See City of Akron v. Akron–Westfield Cmty. Sch. Dist., 659 N.W.2d 223, 225–26 (Iowa 2003). Although on appeal the parties briefed the issue of municipal authorization through delegation in extensive fashion, at oral argument Dubuque's counsel partially conceded the point, agreeing that the parking systems supervisor had the authority to enter contracts, but *not* contracts with an indemnification provision. We assume Dubuque and Maxim had a valid contract and do not reach

pages of terms and conditions. Maxim drafted the terms and conditions, which were printed in a font small enough to make even the youngest eyes feel old; there are approximately sixty lines and fifteen hundred words on each page.

After construction began, cracks were found in buildings neighboring the jobsite. The owners of these buildings sued Dubuque, Maxim, and others. The plaintiffs claimed installation of the ramp's foundation, which consisted of auger cast piles, had disturbed the soil under their buildings. To create the auger cast piles, workers drilled deep holes into the ground and filled them with grout.

The plaintiffs alleged Maxim did not properly monitor installation of the piles and failed to report problems. Maxim cross-claimed against Dubuque. Maxim maintained Dubuque had agreed in some fashion to defend and indemnify Maxim from third-party lawsuits, even if such a lawsuit was predicated upon Maxim's own negligence. Maxim pointed to the eleventh paragraph of its terms and conditions, which read:

11. *Third Party Claims.* In the event any third party brings a suit or a claim for damages against Consultant alleging exposure to or damage from materials, elements or constituents at or from the project site before, during or after services are performed by Consultant under this Agreement, which is alleged to have resulted in or caused any adverse condition to any third party or resulted in claims arising from remedial action, cleanup, uninhabitability of property, or other property damage, Client, except to the extent of Consultant's gross negligence or willful misconduct, agrees to defend, indemnify and hold Consultant harmless against any such suit or claim and any obligation or liability arising therefrom.

Dubuque contended this provision did not apply to the facts of the present case and therefore declined to defend or indemnify Maxim.

A jury decided Maxim was liable to the plaintiffs. In a special verdict,[2] the jury also found Dubuque had a contract with Maxim containing the disputed eleventh paragraph, as well as another paragraph in which Maxim generally agreed to indemnify Dubuque.[3]

Dubuque moved for a judgment notwithstanding the verdict on the cross-claim.

the issue of municipal authorization. Only the terms of the parties' agreement are at issue in this case.

2. The court told the jury that while the cross-claim was an issue of law for the court alone to decide, answering some additional factual questions would help the court reach its decision.

3. The ninth paragraph of the terms and conditions stated:

9. *Indemnification.* Consultant shall defend, indemnify and hold harmless the Client and its officers, employees, servants, agents, successors, and assigns from and against any and all liability, claims, demands, suits, actions, third party claim[s], penalties, fines, debts, accounts, damages, costs, expenses, losses and attorney's fees . . . which directly or indirectly arise out of or result from injury or death to its employees and subcontractors or damage to property, to the extent the injury or damage is caused by the negligent act or willful misconduct of Consultant or its employees, servants and agents in the performance of Consultant's work under this Agreement. . . . Indemnification under this provision shall exclude any and all Damages which either directly or indirectly arise out of or result from acts, errors, or omissions of the Client or any of their officers, employees, servants, agents, consultants, or other representatives. Neither party shall be liable to the other party for any special, indirect, incidental, punitive, or consequen-

Dubuque argued the eleventh paragraph applied only to environmental claims, such as where a chemical migrates onto another's property and requires remedial cleanup. The district court dismissed the cross-claim, and Maxim appealed.

## II. Scope and Standards of Review

■ Appellate review of a grant of a motion notwithstanding the verdict is for correction of errors at law. *Lynch v. Saddler,* 656 N.W.2d 104, 107 (Iowa 2003). Likewise, to the extent this appeal concerns the construction or interpretation of a contract, our review is generally at law. *See Ellefson v. Centech Corp.,* 606 N.W.2d 324, 330 (Iowa 2000); *Iowa Waste Sys., Inc. v. Buchanan County,* 617 N.W.2d 23, 32 (Iowa Ct.App.2000).

## III. The Merits

■ At issue is the scope of an express contract for indemnification. In an indemnification contract, one party promises to reimburse or hold harmless another party for loss, damage, or liability. *See McNally & Nimergood v. Neumann-Kiewit Constructors, Inc.,* 648 N.W.2d 564, 570 (Iowa 2002). The eleventh paragraph contains such a promise: Dubuque "agree[d] to defend, indemnify and hold [Maxim] harmless against" certain third-party claims. The intent of the parties controls, and in this case the plain language of the agreement manifests the requisite intent. *See id.* The only issue concerns the scope of that intent, as expressed in the language of the parties' written contract.

By its terms, the indemnification clause applied only if (1) a third party sued Maxim; (2) the third party alleged "exposure to or damage from materials, elements or constituents at or from the project site"; (3) this exposure or damage "resulted in or caused any adverse condition to any third party or resulted in claims arising from remedial action, cleanup, uninhabitability of property, or other property damage"; and (4) Maxim was not grossly negligent and did not commit willful misconduct. If all four of these conditions applied, Dubuque was obligated to defend and indemnify Maxim. The first and fourth conditions were met; the plaintiffs were plainly third parties, and there was no allegation Maxim committed anything more than ordinary negligence.

Maxim takes an expansive view of the potential scope of the eleventh paragraph and seizes upon several of the broad and general phrases in second and third conditions to bolster its case. For example, Maxim argues soil is a "material," "element," or "constituent" because the dictionary defines "element" as "one of the simple substances or principles of which according to early natural philosophers, the physical universe is composed, the four elements pointed out by Empedocles being fire, air, water, *earth.*" *Black's Law Dictionary* 520 (6th ed. 1990) (emphasis added). Maxim also contends it is plain that its negligent acts resulted in an "adverse condition" to the plaintiffs.

The district court took a less expansive view of the provision, and so do we. We do not think the plain language of the

---

tial damages, whether based on contract, tort (including negligence), strict liability or otherwise.

Maxim argues the ninth paragraph does not apply to this case because the plaintiffs' damages, either directly or indirectly, arose out of

or resulted from Dubuque's negligence. (The jury found Dubuque was also at fault in causing damage to the plaintiffs' buildings.) Because our analysis focuses strictly upon the eleventh paragraph of the agreement, we do not reach this issue.

contract clearly and unambiguously expresses an intention that Dubuque indemnify Maxim under the circumstances alleged here, where there is no evidence of an environmental-type claim.

In determining the intent of the parties from the plain language of the agreement, a special rule of construction applies when, as here, a party asserts indemnification from its own negligence. *McNally & Nimergood,* 648 N.W.2d at 571.

This rule provides that indemnification contracts will not be construed to permit an indemnitee to recover for its own negligence unless the intention of the parties is clearly and unambiguously expressed. *See McComas–Lacina Constr. Co.* [*v. Able Constructors*], 641 N.W.2d [841,] 845 [(Iowa 2002)]; *Sears, Roebuck & Co. v. Poling,* 248 Iowa 582, 588, 81 N.W.2d 462, 465 (1957).... Thus, indemnification contracts claimed to contain these provisions are construed more strictly than other contracts. *Exide Corp. v. Millwright Riggers, Inc.,* 727 N.E.2d 473, 482 (Ind.Ct.App.2000); *Amoco Prod. Co. v. EM Nominee P'ship,* 2 P.3d 534, 541 (Wyo.2000).

*Id.*; *see also* 11 Richard A. Lord, *Williston on Contracts* § 32:20, at 533–34 (4th ed. 1999) [hereinafter *Williston on Contracts*] (indemnification provisions, as exculpatory clauses, are frequently construed strictly against the party seeking the benefit). This rule of construction dovetails with one of our rules of interpretation, insofar as any ambiguity in the exceptionally fine print of this contract must also be construed strictly against Maxim, its drafter. *See Iowa Fuel & Minerals, Inc. v. Iowa State Bd. of Regents,* 471 N.W.2d 859, 862–63 (Iowa 1991).

With these principles in mind, we turn to the language of the indemnity provision.

It is at once broad and narrow. On the one hand, we find broad and seemingly limitless phrases such as "materials, elements or constituents" and "other property damage"; on the other hand, indemnification appears limited to environmental-type claims, insofar as specific and prominent reference is made to indemnification for suits alleging "remedial action," "cleanup," or "uninhabitability of property." We need only, however, focus upon the aforementioned third condition; reference to "remedial action," "cleanup," and "unhabitability of property" indicates this provision was only intended to apply to environmental-type claims.

"Remedial action" is a term of art in federal environmental law. 42 U.S.C. § 9601(24) (2000); *see also Iowa Comprehensive Petroleum Underground Storage Tank Fund Bd. v. Shell Oil Co.,* 606 N.W.2d 376, 381 (Iowa 2000) (employing term "remedial action" in discussion of federal Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9601–75). A remedial action is defined as a permanent measure taken "to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment." 42 U.S.C. § 9601(24); *see City of New York v. Exxon Corp.,* 633 F.Supp. 609, 614 (S.D.N.Y.1986) (remedial actions are generally those long-term measures taken to restore environmental quality). Likewise, the term "cleanup" is plainly associated with environmental practice. *See generally Cooper Indus., Inc. v. Aviall Servs., Inc.,* — U.S. ——, 125 S.Ct. 577, 160 L.Ed.2d 548 (filed Dec. 13, 2004) (repeatedly employing "cleanup" in discussion of CERCLA). Indeed, "remedial action" itself is a specific form of cleanup. *See Fort Ord Toxics*

*Project, Inc. v. Cal. EPA,* 189 F.3d 828, 833–34 (9th Cir.1999); *see also* 42 U.S.C. § 9601(23), (defining removal action), (24) (defining remedial action). It is also plain that environmental problems may cause damage to property, including rendering it uninhabitable. In light of the use of these environmentally loaded terms, a strict construction of this provision requires that use of the general phrases be read in context and limited to environmental-type claims to determine the intent of the contracting parties.

 In part, we are guided by the familiar precept of *ejusdem generis*. *Ejusdem generis* (Latin for "of the same kind or class")

> is a well-established rule of construction used to aid in ascertaining the meaning of written instruments. It is sometimes known as Lord Tenterden's Rule; and it means that "where an enumeration of specific things is followed by some more general word or phrase, such general word or phrase is to be held to refer to things of the same kind . . . ."

*Hewitt v. Whattoff,* 251 Iowa 171, 175, 100 N.W.2d 24, 26 (1959) (citation omitted); *see also Messerschmidt v. City of Sioux City,* 654 N.W.2d 879, 884 (Iowa 2002); *Fleur de Lis Motor Inns, Inc. v. Bair,* 301 N.W.2d 685, 690 (Iowa 1981); *Williston on Contracts* § 32:10, at 451–53. For example, in light of the preceding string of terms "remedial action," "cleanup," and "uninhabitability," use of the subsequent phrase "or other property damage," upon which Maxim in part relies, can only be understood to be intended to refer to the same subject matter as the string of terms, only with added flexibility. This flexibility, of course, is designed to accommodate for similar environmental costs not specifically included in the prior three

terms. *See Messerschmidt,* 654 N.W.2d at 884 (ultimate term "otherwise" in string was intended to define preceding terms with flexibility); *cf.* H.L.A. Hart, *The Concept of Law* 127–28 (2d ed. 1994) (pointing out the "open texture" of legal standards and language). For similar reasons, we do not think paragraph eleven clearly and manifestly expresses an intention of the parties for indemnification in a non-environmental-type claim such as the one here, wherein the plaintiffs alleged Maxim negligently performed its duty to monitor the construction.

In the alternative, Maxim contends the duty to defend is broader than the duty to indemnify. Maxim cites several insurance cases, in which we have held the insurer's duty to defend was separate from, and broader than, its duty to indemnify. *See, e.g., Employers Mut. Cas. Co. v. Cedar Rapids Television Co.,* 552 N.W.2d 639, 642 (Iowa 1996). It is true we have held that when "any claim alleged against the insured can rationally be said to fall within such coverage, the insurer must defend the entire action" and doubts regarding the extent of the insured's coverage should be resolved in the insured's favor. *Id.; see A.Y. McDonald Indus., Inc. v. Ins. Co. of N. Am.,* 475 N.W.2d 607, 627 (Iowa 1991); *see also First Newton Nat'l Bank v. Gen. Cas. Co.,* 426 N.W.2d 618, 630 (Iowa 1988) (recognizing majority rule that "when an action against an insured involves both covered and noncovered claims, the insurer is liable for recovery of damages on only the covered claims but has a duty to defend the entire action"). Although this case is not set in an insurance context, there was plainly no duty to defend *any* claim, because the contract clearly applied only to environmental-type claims, which were not asserted here.

## IV. Conclusion

Because we find the parties' agreement does not clearly and unambiguously ex-

press an intention that Dubuque indemnify Maxim under the circumstances of this case, we affirm dismissal of Maxim's claim. Nor is the duty to defend in the parties' contract broader than the duty to indemnify.

**AFFIRMED.**